UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN MOODY, et al.,

                Plaintiffs,                    Case No. 12-cv-13593
                                             HON. GERSHWIN A. DRAIN

vs.


MICHIGAN GAMING CONTROL BOARD,
et al.,
                Defendants.

_____/

### ORDER DENYING MOTION FOR RECONSIDERATION [#35]

I.        Introduction

Plaintiffs John Moody, Donald Harmon, Rick Ray, and Wally McIlmurray, Jr., filed the instant 42 U.S.C. § 1983 action on August 14, 2012 seeking declaratory and injunctive relief concerning the legality of the suspension of their harness racing occupational licenses by Defendants, the Michigan Gaming Control Board ("MGCB"), Richard Kalm, Gary Post, Daryl Parker, Richard Garrison, Billy Lee Williams, John Lessnau and Al Ernst.

On November 2, 2012, the Court conducted oral argument on Plaintiffs' Motion for Preliminary Injunction and denied Plaintiffs' Motion for a Preliminary Injunction. *See* Dkt. No. 28. Presently before the Court is Plaintiffs' Motion for Reconsideration of this Court's November 2, 2012 order, filed on November 16, 2012.[1] On January 18, 2013, Plaintiffs filed a Supplemental Brief in

_____

[1] Plaintiffs filed their original Motion for Reconsideration on November 19, 2012, and filed a Corrected Motion for Reconsideration on November 27, 2012. *See* Dkt. Nos. 33 and 35.

Support of their Motion for Reconsideration. *See* Dkt. No. 38. For the reasons that follow, the Court denies Plaintiffs' Motion for Reconsideration.

## II.   Factual Background

Plaintiffs have been involved in harness racing throughout the United States, including in Michigan. In 2009, Defendant Gary Post, then Operations Manager of the Horse Racing Section of the MGCB, received an anonymous tip about several drivers, trainers, and gamblers involved in a race fixing scheme that took place in 2008 and 2009. Following this telephone call, Post immediately began an investigation and enlisted steward Robert Coberley to help in reviewing suspicious races. Initially, Coberley and Post focused their attention on eight harness races which included the Plaintiffs as participants. After investigating these races, the MGCB reported its findings to the Michigan State Police ("MSP").

Thereafter, MSP conducted an investigation and later executed search warrants for certain owners, trainers and gamblers, including Plaintiff Arthur McIlmurray. On March 11, 2010, the MSP interviewed McIlmurray, who identified Plaintiffs John Moody, Donald Harmon, Wally McIlmurray, Jr. and others as being key participants in a race-fixing scheme. The MSP interviewed Plaintiff John Moody on March 12, 2010, wherein Moody implicated Harmon as being involved in the scheme.[2]

The MGCB summoned each of the Plaintiffs for administrative stewards hearings,[3] which took place on May 20, 2010. Plaintiffs claim that on several occasions prior to their appearance at

---

[2]  Defendants maintain that Moody implicated himself in the scheme, however the transcript provided by Defendants does not include any admissions by Moody concerning his involvement in the alleged scheme. *See* Defs.' Supp. Br. in Opp., Ex. 2.

[3]  A stewards hearing is a regulatory hearing under the authority of the MGCB. *See* Mich. Admin. Code R. 431.1260.

the hearings, Post and MSP investigators advised their counsel, Joseph A. Niskar, that the Plaintiffs were suspects in a race-fixing scheme and that they would be arrested at the conclusion of the hearings. Plaintiffs further maintain that prior to the hearings, Niskar informed Post that the Plaintiffs intended to invoke their Fifth Amendment rights at the hearings and this constituted "just cause" within the meaning of Michigan Compiled Laws 431.307(8).

Moody's hearing was first. Post, as well as representatives from the Michigan Attorney General, attended the hearing. When Moody, a catch driver for the industry, was asked whether "he ever failed to put forth his best effort in a race," or took "any money or anything else of value in exchange . . . for the outcome of a race," he replied, "[o]n the advice of my attorney I refuse to answer this question and I invoke my Fifth Amendment right against self-incrimination." When asked whether he knew Sam Summa or Tony Shamoun,[4] he again asserted his Fifth Amendment rights. Lastly, when asked about the occupational license application he signed, Moody also invoked his Fifth Amendment rights. The license application states in relevant part:

> I expressly agree to be subject to the subpoena powers of the Michigan Gaming Control Board (MGCB), Horse Racing Section or a written request issued in lieu of a subpoena and to provide the MGCB Horse Racing Section with any and all such information or documents which the MGCB Horse Racing Section may so request as authorized under the Michigan Racing Law and rules. I further consent to be subject to the searches provided for in Public Act 279 of 1995, Section 16(4) that authorizes personal inspections including urine and breathalyzer tests, inspections of any personal property, and inspections of premises and property related to my participation in a race meeting by persons authorized by the MGCB Horse Racing Section. I agree to fully cooperate with the MGCB Horse Racing Section regulatory investigations and law enforcement investigations related to racing. I also agree to report racing violations and/or criminal activity occurring at or away from the track to the MGCB Horse Racing Section or local, state, and federal law enforcement agencies.

---

[4] It is unclear from the record how these particular individuals were involved in the scheme.

Defs.' Br. in Opp., Ex. 3.  The other Plaintiffs provided similar answers during their hearings.  They all invoked their Fifth Amendment rights and refused to acknowledge whether they knew Shamoun or Summa or whether they were aware of anybody else that may have engaged in race-fixing. Plaintiffs also relied on the Fifth Amendment when they refused to bring their 2008 and 2009 bank records that the MGCB requested in its summons for each individual.

Unlike Moody, the other Plaintiffs acknowledged signing the license application form and agreed they were required to cooperate with any investigation as a condition precedent to obtaining and maintaining their occupational licenses.  Further, Plaintiffs were advised that failure to cooperate with the investigation could subject them to suspension or revocation of their licenses.

On May 20, 2010, the stewards issued their rulings.  The rulings suspended the Plaintiffs' occupational licenses until December 31, 2010–at which time the occupational licenses expired and a renewal application was required to be filed in order to maintain their occupational licenses.  The reasons given for each Plaintiff's suspension was the same in each decision issued by the stewards.

After their suspensions, Plaintiffs filed an Emergency Motion for Declaratory, Injunctive Relief and for a Temporary Restraining Order (TRO) in the Wayne County Circuit Court.  The Honorable John Murphy denied Plaintiffs request for a TRO but scheduled a show cause hearing on June 4, 2010.  Plaintiffs argued that they satisfied the four requirements for injunctive relief.  Judge Murphy disagreed, concluding that there was no likelihood of success on the merits and that the public harm involved in granting injunctive relief was greater than the harm to Plaintiffs.  *Id*., Ex. 5. The Michigan Court of Appeals affirmed Judge Murphy's decision.  The Michigan Court of Appeals determined that Plaintiffs' appeal was moot, and that even if it were not moot, they failed to address all of the requirements for injunctive relief.  The court did not address Plaintiffs' constitutional violation arguments. Plaintiffs did not file an application for leave to appeal to the Michigan Supreme

Court.

On November 30, 2010, while the appeal was pending before the Michigan Court of Appeals, the MGCB issued an Order of Exclusion for each Plaintiff.  On August 8, 2011, all of the Plaintiffs submitted license applications for the 2011 licensing year, however none of their applications were considered based on the Exclusion Orders.  Nevertheless, Plaintiffs filed appeals of the "denial [sic] of 2011 occupational license."[5]  *Id.*, Ex. 8.  On November 16, 2011, Al Ernst, Racing Manager for the MGCB, responded to Plaintiffs' appeals indicating that, based on the Exclusion Orders, Plaintiffs were prohibited from being licensed in the State of Michigan under the Racing Act.  *Id.*, Ex. 9.  He further noted that, "[a]s a result, your application was neither approved nor denied.  Rather, it was not considered based on the language of the Exclusion Order."  *Id.*  Ernst advised Plaintiffs that "the time to appeal the Exclusion Order has long passed."  *Id.*

Plaintiffs again submitted license applications in January of 2012.  On or about January 15, 2012, Moody contacted MGCB regarding the status of Plaintiffs' license applications.  Compl., ¶ 59. Ernst advised Moody that he and the other Plaintiffs were ineligible for a license as long as they had legal counsel.  *Id.*  Deputy Director Erik Pederson responded to Plaintiffs' applications by indicating that when Plaintiffs initiated judicial proceedings in the Wayne County Circuit Court, their administrative appeals of their occupational license suspensions was placed on hold, as required by law.  *Id.*, Ex. 10.  He advised Plaintiffs that the Exclusion Orders excluded Plaintiffs indefinitely from licensure.  *Id.*  Pederson's letter also informed Plaintiffs that the suspension and exclusion orders were based upon Plaintiffs failure to cooperate at the stewards investigative hearing as required by

---

[5]  Moody claims that in August of 2011, he met with Ernst about reapplying for their licenses.  Compl. at ¶ 58.  Ernst advised that he had the power to approve Plaintiffs' applications if they made a deal with the MGCB.  *Id.*  Plaintiffs refused to make such a deal since they had nothing wrong.  *Id.*

Mich. Admin. Code Rule 431.1035.  *Id.*

Plaintiffs' Complaint contains a count for declaratory relief, wherein Plaintiffs assert that they are entitled to judgment declaring that their constitutional rights have been violated by issuance of the suspension and exclusion orders, and by refusing to renew their licenses unless Plaintiffs forfeited their rights to counsel and the Fifth Amendment privilege against self incrimination. Compl., ¶ 70 Further, Plaintiffs are entitled to a declaration that their licenses were unlawfully terminated and they are entitled to restoration of their licenses and privileges to participate in horse racing in the State of Michigan.  *Id.*, ¶ 72.  Plaintiffs also assert a claim for injunctive relief enjoining Defendants from refusing to issue racing licenses or from terminating Plaintiffs' racing licenses based on the invocation of their Fifth Amendment rights.  *Id.*, ¶ 74. In Count III, Plaintiffs allege a Fourth Amendment violation for Defendants deprivation of their liberty interest to engage in a lawful occupation.  *Id.*, ¶¶ 76-78.   Plaintiffs also assert a procedural Due Process violation claim.  *Id.*, ¶¶ 80-82.  Lastly, Plaintiffs bring a claim for "unconstitutional conditions" pursuant to the 5th and 14th Amendments because "[t]he Government may not condition the exercise or enjoyment of a constitutional right (the Fourth Amendment right to engage in a legal occupation and the Fifth and Fourteenth Amendment rights not to be deprived of property without due process of law) on pain of having to forfeit another constitutional right (the right not to be forced to incriminate oneself under the Fifth Amendment . . . .)."  *Id.*, ¶ 85.

III.    Law & Analysis

Local Rule 7.1(g)(3) of the Local Rules of the United States District Court for the Eastern District of Michigan provides:

> [M]otions for rehearing or reconsideration which merely present the same issues ruled upon by the court, either expressly or by reasonable implication, shall not be granted.

The movant shall not only demonstrate a palpable defect by which the court and the parties have been misled but also show that a different disposition of the case must result from a correction thereof.

E.D. Mich. L.R. 7.1(g)(3).

In their Motion for Reconsideration, Plaintiffs claim that there are palpable defects by which this Court has been misled, the correction of which will result in a different disposition of the Court's November 2, 2012 decision denying Plaintiffs' Motion for Preliminary Injunction. Four factors must be balanced and considered before the court may issue a preliminary injunction pursuant to Fed.R.Civ.P. 65(b): (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) the harm to others which will occur if the injunction is granted; and (4) whether the injunction would serve the public interest. *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985); *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); and *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989).

"None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). Preliminary injunctive relief "is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F. 3d 800, 808 (6th Cir. 2001).

At the hearing on Plaintiffs' Motion for Reconsideration, the Court concluded that the first and second factors favored the Defendants and the third and fourth factors were essentially neutral. The Court also found that the Plaintiffs failed to provide any legal authority that a preliminary injunction was warranted under the circumstances. Plaintiffs contend that Defendants misled the Court at the November 2, 2012 hearing when Defendants represented that they are willing to process Plaintiffs' applications and were, in fact, doing so for Plaintiff Ray. Plaintiffs claim that this is

untrue.  Plaintiffs also direct the Court to a January 8, 2013 letter from Ernst wherein Ernst indicates that a Michigan Administrative Hearing will be scheduled concerning the Plaintiffs' suspensions and that their applications will not be considered until the conclusion of the hearing.

Upon review of Plaintiffs' Motion for Reconsideration and the arguments presented therein, as well as the arguments in Plaintiffs' Supplemental Brief, the Court finds that Plaintiffs have failed to demonstrate a palpable defect by which this Court has been misled, the correction of which will lead to the entry of preliminary injunctive relief ordering Defendants to reinstate or issue Plaintiffs' licenses.

A) Likelihood of Success on the Merits

Upon review of this factor, the Court finds no reason to alter its original conclusion that the legal authority relied on by Plaintiffs does not suggest a likelihood of success on their claims. Further, as the Court indicated on the record at the November 2, 2012 hearing, none of the cases relied upon by Plaintiffs demonstrate that the extraordinary remedy of a preliminary injunction is warranted here. *See Wilkerson v. Johnson,* 699 F.2d 325, 328 (6th Cir. 1983)*; Bower v. Mt. Sterling*, 44 F.App'x 670, 674 (6th Cir. 2002); *Gardner v. Broderick*, 392 U.S. 273 (1968).

B) Irreparable Injury

At the November 2, 2012 hearing, this Court concluded that Plaintiffs could not establish irreparable injury because their purported injuries are monetary in nature; i.e. loss of ability to earn a living. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).  Plaintiffs have failed to show a palpable defect in this Court's conclusion that should Plaintiffs prevail on their claims, their damages can be readily ascertainable.

C) Harm to Others if Injunction is Granted

-8-

Here, Plaintiffs have failed to present any argument or evidence that this factor weighs in their favor.  Plaintiffs argue that no harm will result by the issuance of an injunction because there is simply no evidence that they were ever involved in an illegal race-fixing scheme.  However, by allowing individuals who are the subject of an administrative investigation to refuse to cooperate and continue to race undermines the integrity of the entire racing industry.   Thus, this factor does not weigh in favor of granting a permanent injunction.

D)   Public Interest

Here, Plaintiffs have failed to demonstrate this factor weighs in their favor. The public interest will not be served if Plaintiffs are granted a permanent injunction.  The perception that illegal race fixing has occurred and will continue to occur without repercussions undermines the public's confidence in the gaming industry.

Thus, based on the foregoing, the Court declines to reconsider its initial determination that the extraordinary remedy of a preliminary injunction is not warranted under the circumstances.

IV.   Conclusion

For the reasons stated above, Plaintiffs' Corrected Motion for Reconsideration [#35] is DENIED.

Plaintiffs' Motion for Reconsideration [#33] is MOOT.

SO ORDERED.

Dated: March 4, 2013                                  /s/Gershwin A Drain
                                                     GERSHWIN A. DRAIN
                                                     U.S. DISTRICT JUDGE