UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN MOODY, *et al.*,

       Plaintiffs,                           Case No. 12-cv-13593
                                                HON. GERSHWIN A. DRAIN

vs.

MICHIGAN GAMING CONTROL BOARD,
*et al.*,
       Defendants.

_____/

**<u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#85], DENYING PLAINTIFFS' AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT [#98], FINDING PLAINTIFFS' MOTION FOR ORDER TO ALLOW DEPOSITION OF NON-PARTY WITNESS THOMAS DECLERQ MOOT [#97], GRANTING DEFENDANTS' MOTION TO STRIKE [#112], DENYING PLAINTIFFS' MOTION TO FILE SUPPLEMENTAL AUTHORITY [#114] AND DISMISSING ACTION</u>**

**I.    INTRODUCTION**

Plaintiffs, John Moody, Donald Harmon, Rick Ray, and Wally McIlmurray, Jr., filed the instant 42 U.S.C. § 1983 action on August 14, 2012 seeking declaratory and injunctive relief concerning the legality of the suspension of their harness racing occupational licenses by Defendants, the Michigan Gaming Control Board ("MGCB"), Richard Kalm, Gary Post, Daryl Parker, Richard Garrison, Billy Lee Williams, John Lessnau and Al Ernst. Presently before the Court is Defendants' Motion for Summary Judgment, filed on June 3, 2013. Also before the Court is Plaintiffs' Amended Motion for Partial Summary Judgment, filed on July 2, 2013. These matters are fully briefed and a hearing was held on September 10, 2013. For the reasons that follow, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiffs' Amended Motion for Partial Summary

Judgment.

## II. FACTUAL BACKGROUND

Plaintiffs have been involved in harness racing throughout the United States, including in Michigan. In 2009, Defendant Gary Post, then Operations Manager of the Horse Racing Section of the MGCB, received an anonymous tip about several drivers, trainers, and gamblers involved in a race fixing scheme that took place in 2008 and 2009. Following this telephone call, Post immediately began an investigation and enlisted steward Robert Coberley to help in reviewing suspicious races. Initially, Coberley and Post focused their attention on eight harness races which included the Plaintiffs as participants. After investigating these races, the MGCB reported its findings to the Michigan State Police ("MSP").

Thereafter, MSP conducted an investigation and later executed search warrants for certain owners, trainers and gamblers, including Plaintiff Arthur McIlmurray. On March 11, 2010, the MSP interviewed McIlmurray, who identified Plaintiffs John Moody, Donald Harmon, Wally McIlmurray, Jr. and others as being key participants in a race-fixing scheme where drivers would finish fifth place or lower in certain races to benefit known gamblers. For their participation in the scheme, these drivers were paid by gamblers Haitham Shamoun and Saleh Summa. The MSP interviewed Plaintiff John Moody on March 12, 2010, wherein Moody implicated not only himself but the other Plaintiffs in these activities. Moody admitted that in fifteen to twenty races he did "not drive very, very aggressive" and estimated Summa paid him roughly $5,000.00 total for his participation in the race fixing scheme. The Plaintiffs have since repudiated these statements claiming they were coerced by the MSP into admitting wrongdoing.

Thereafter, the MGCB summoned each of the Plaintiffs for administrative stewards hearings,

which took place on May 20, 2010. Plaintiffs received advance notice of the hearings, and each summons identified the purpose of the hearing, its time and location and what documents were to be produced. The summonses further advised the Plaintiffs that they were entitled to have an attorney represent them at the hearing if they chose to retain counsel.

Thereafter, Plaintiffs met with and retained Joseph Niskar to represent them. Plaintiffs claim that on several occasions prior to their appearance at the hearings, Sergeant Thomas DeClerq of the MSP advised Niskar that the Plaintiffs were suspects in a race-fixing scheme and that they would be arrested at the conclusion of the hearings. Plaintiffs further maintain that prior to the hearings, Niskar informed Post that the Plaintiffs intended to invoke their Fifth Amendment rights at the hearings and this constituted "just cause" within the meaning of Michigan Compiled Laws 431.307(8).

Moody's hearing was first. Post, as well as representatives from the Michigan Attorney General, attended the hearing. When Moody, a catch driver for the industry, was asked whether "he ever failed to put forth his best effort in a race," or took "any money or anything else of value in exchange . . . for the outcome of a race," he replied, "[o]n the advice of my attorney I refuse to answer this question and I invoke my Fifth Amendment right against self-incrimination." When asked whether he knew Summa or Shamoun, he again asserted his Fifth Amendment rights. Lastly, when asked about the occupational license application he signed, Moody also invoked his Fifth Amendment rights. The license application states in relevant part:

> I expressly agree to be subject to the subpoena powers of the Michigan Gaming Control Board (MGCB), Horse Racing Section or a written request issued in lieu of a subpoena and to provide the MGCB Horse Racing Section with any and all such information or documents which the MGCB Horse Racing Section may so request as authorized under the Michigan Racing Law and rules. I further consent to be subject to the searches provided for in Public Act 279 of 1995, Section 16(4) that authorizes personal inspections including urine and breathalyzer tests, inspections of any personal property, and inspections of premises and property related to my

>participation in a race meeting by persons authorized by the MGCB Horse Racing Section. I agree to fully cooperate with the MGCB Horse Racing Section regulatory investigations and law enforcement investigations related to racing. I also agree to report racing violations and/or criminal activity occurring at or away from the track to the MGCB Horse Racing Section or local, state, and federal law enforcement agencies.

The other Plaintiffs provided similar answers during their hearings. They all invoked their Fifth Amendment rights and refused to acknowledge whether they knew Shamoun or Summa or whether they were aware of anybody else that may have engaged in race-fixing. Plaintiffs also relied on the Fifth Amendment when they refused to bring their 2008 and 2009 bank records that the MGCB requested in its summons for each individual.

Unlike Moody, the other Plaintiffs acknowledged signing the license application form and agreed they were required to cooperate with any investigation as a condition precedent to obtaining and maintaining their occupational licenses. Further, Plaintiffs were advised that failure to cooperate with the investigation could subject them to suspension or revocation of their licenses.

On May 20, 2010, the stewards issued their rulings. The rulings suspended the Plaintiffs' occupational licenses until December 31, 2010–at which time the occupational licenses expired and a renewal application was required to be filed in order to maintain their occupational licenses. The reasons given for each Plaintiff's suspension was the same in each decision issued by the stewards. Specifically, the stewards concluded that the Plaintiffs had "failed to comply with the conditions precedent for occupational licensing in Michigan as outlined in R431.1035."[1]

---

[1] Michigan Administrative Code Regulation 431.1035(2)(d) states:

>(2)    Application for an occupational license means consent and agreement by the applicant,, upon application and for the duration of the occupational license, if issued, to all of the following conditions precedent:
>
>\*              \*              \*

After their suspensions, Plaintiffs filed an appeal of their suspensions with the MGCB, as well as filed an Emergency Motion for Declaratory, Injunctive Relief and for a Temporary Restraining Order (TRO) in the Wayne County Circuit Court. Because the Plaintiffs had filed an action in state court, the Defendants determined it was reasonable to delay the administrative appeal until the state court ruled on the Plaintiffs request for injunctive relief. The Honorable John Murphy denied Plaintiffs request for a TRO but scheduled a show cause hearing on June 4, 2010. Plaintiffs argued that they satisfied the four requirements for injunctive relief. Judge Murphy disagreed, concluding that there was no likelihood of success on the merits and that the public harm involved in granting injunctive relief was greater than the harm to Plaintiffs. *Id*., Ex. 5. The Michigan Court of Appeals affirmed Judge Murphy's decision. The Michigan Court of Appeals determined that Plaintiffs' appeal was moot, and that even if it were not moot, they failed to address all of the requirements for injunctive relief. The court did not address Plaintiffs' constitutional violation arguments. Plaintiffs did not file an application for leave to appeal to the Michigan Supreme Court.

After the Court of Appeals' decision, Defendants asked Plaintiffs on several occasions whether they wanted to pursue their administrative appeal. However, it was not until November 27, 2012, after the initiation of the instant action, that Plaintiffs confirm they wished to proceed with their appeal of the stewards' hearing. The administrative appeal was heard on April 25, 2013 and a decision was issued in October of this year. The record is silent as to the outcome of the Plaintiffs' administrative appeal of the stewards' decision.

---

    (d)    That the applicant will conduct himself or herself and his or her business at all times in a manner befitting the best interests of racing and shall cooperate in every way with the commissioner or his or her representatives during the conduct of an investigation, including responding correctly, to the best of his or her knowledge, to all questions pertaining to racing matters.

On November 30, 2010, while the appeal was pending before the Michigan Court of Appeals, the MGCB issued an Order of Exclusion for each Plaintiff. On August 8, 2011, all of the Plaintiffs submitted license applications for the 2011 licensing year, however none of their applications were considered based on the Exclusion Orders. Nevertheless, Plaintiffs filed appeals of the "denial [sic] of 2011 occupational license." On November 16, 2011, Al Ernst, Racing Manager for the MGCB, responded to Plaintiffs' appeals indicating that, based on the Exclusion Orders, Plaintiffs were prohibited from being licensed in the State of Michigan under the Racing Act. *Id.*, Ex. 9. He further noted that, "[a]s a result, your application was neither approved nor denied. Rather, it was not considered based on the language of the Exclusion Order." *Id.* Ernst advised Plaintiffs that "the time to appeal the Exclusion Order has long passed." *Id.*

Plaintiffs again submitted license applications in January of 2012. On or about January 15, 2012, Moody contacted MGCB regarding the status of Plaintiffs' license applications. Moody claims that Ernst advised him that he and the other Plaintiffs were ineligible for a license as long as they had legal counsel. Deputy Director Erik Pederson responded to Plaintiffs' applications by indicating that when Plaintiffs initiated judicial proceedings in the Wayne County Circuit Court, their administrative appeals of their occupational license suspensions was placed on hold. He requested that Plaintiffs inform him if they wished to pursue their appeal of the stewards' decision. He also informed Plaintiffs that the suspension and exclusion orders were based upon Plaintiffs failure to cooperate at the stewards investigative hearing as required by Mich. Admin. Code Rule 431.1035. *Id.*

-6-

### III. LAW & ANALYSIS

#### A. Standard of Review

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no

genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B. Defendants' Motion for Summary Judgment

#### 1. 11th Amendment Immunity

As an initial matter, Plaintiffs cannot bring this action against the State of Michigan's MGCB because their claims are barred by the doctrine of sovereign immunity. *See Johnson v. Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004) ("The state of Michigan . . . has not consented to being sued in civil rights actions in the federal courts."); *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In addition to the States themselves, the Eleventh Amendment immunizes departments and agencies of the states. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Therefore, to the extent Plaintiffs raise claims for money damages against the MGCB or the Defendants in their official capacities, such claims are barred by the Eleventh Amendment.

#### 2. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity because Plaintiffs have failed to identify the violation of a constitutional right, as well as failed to demonstrate that Defendants actions were not authorized under the law.

Government officials are generally immune from liability and civil damages insofar as their

conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person should have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity recognizes that "reasonable mistakes can be made," and protects "all but the plainly incompetent or those who knowingly violate the law." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008).

Whether qualified immunity applies is a legal question. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985). This Court must undertake a two-part inquiry: (1) whether the Plaintiffs have alleged the deprivation of a constitutional right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. Here, the Court concludes that Defendants are entitled to qualified immunity because Plaintiffs have failed to demonstrate the deprivation of a constitutional right.

### i. Substantive Due Process

Plaintiffs maintain that Defendants have violated their substantive due process rights because they have a constitutionally protected property and liberty interest in their right to pursue a lawful occupation. Conversely, Defendants argue horse racing is a state licensed and highly regulated form of gambling, thus it does not fall within the ambit of life's common occupations. Because the Court concludes that harness racing is not one of life's common occupations, Plaintiffs cannot demonstrate their constitutional rights have been violated entitling Defendants to judgment in their favor on Plaintiffs' substantive due process claim.

Substantive due process under the Fourteenth Amendment "protects specific fundamental rights of individual freedom and liberty deprivation at the hands of arbitrary and capacious government action." *Gutziller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). To establish a violation of substantive due process, Plaintiffs must first show the existence of a constitutionally-protected property or liberty interest. *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 201-04 (6th Cir. 1995). The United States Supreme Court has recognized that a liberty interest includes "the right of the individual . . . to engage in any of the common occupations of life." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972); *R.S.S.W., Inc. v. City of Keego Harbor*, 18 F. Supp. 2d 738 (E.D. Mich. 1998); *Sanderson v. Village of Greenhills,* 726 F.2d 284, 286-87 (6th Cir. 1984).

However, the term "any occupation" does not encompass every conceivable type of occupation. *See Van Horn v. Nebraska State Racing Comm'n*, 304 F. Supp. 2d 1151, 1167 (D. Neb. 2004) (concluding that the plaintiff did not have a liberty interest in practicing veterinary medicine at the racetrack). Jobs in the horse racing industry are gambling related occupations that can be completely outlawed by the state legislature if it chooses. Moreover, the State of Michigan has a legitimate interest in regulating jobs in the gambling industry so that it can adequately protect the wagering public. The Horse Racing Act provides the Racing Commissioner with discretionary authority to issue occupational licenses. *See* MICH. COMP. LAWS § 431.308(1). Therefore, occupations in the horse racing industry are not common occupations of life and do not have a recognized liberty interest for purposes of due process. *See Medina v. Rudman*, 545 F.2d 244, 251 (1st Cir. 1976) ("[W]e do not consider racetrack ownership to be one of life's common occupations."); *Lasky v. Van Lindt*, 115 Misc.2d 259 (N.Y. Sup. Ct. 1982) ("[S]ince owning,

training, and racing horses is not one of life's common occupations, it may be subject to the strictest regulation."); *Payne v. Fontenot*, 925 F.Supp. 414, 424-25, n.5 (M.D. La. 1995) (concluding that operating a video gaming establishment is an "uncommon occupation" because the state has a high interest in regulating its gambling industry); *Ziskis v. Kowalski*, 726 F.Supp. 902, 910-11 (D. Conn. 1989) (legalized gambling is not a protected liberty interest).

Similarly, Plaintiffs cannot establish they have a property right in the mere expectation of being licensed by the Racing Commissioner. *See Roth*, 408 U.S. at 577. Under the Horse Racing Law, an occupational license expires at the end of the calendar year. Renewal is not automatic; instead individuals are requires to submit an application for each year. This application process, including screening of potential licensees, applies even if an individual was licensed during a previous year. Plaintiffs were last licensed in mid-2010, therefore they cannot claim a property interest in the mere desire for a license. Moreover, Plaintiffs "cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

Based on the foregoing, the Court concludes that Defendants are entitled to judgment in their favor as to Plaintiffs' substantive due process claim.

### ii. Procedural Due Process

Plaintiffs claim they were deprived of procedural due process, however their claim fails as a matter of law because they were provided adequate notice and an opportunity to be heard prior to the suspension of their occupational licenses.

Generally, procedural due process requires a state action to "provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." *Warren v.*

*City of Athens, Ohio*, 411 F.3d 697, 708 (6th Cir. 2005). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mator v. City of Ecorse*, 30 F. App'x 476, 480 (6th Cir. 2008).

Here, Plaintiffs were provided procedural due process before any adverse action was taken against their licenses for failing to cooperate. The Stewards' summonses provided each Plaintiff with advance notice of the hearing, the purpose of the hearing and that they had a right to be represented by counsel at the hearing. Plaintiffs were ultimately suspended for failing to comply with the conditions precedent for occupational licensing under the Horse Racing Act, Mich. Admin. Code R. 431.1035(2). The Stewards' decision identified the rules under which the Plaintiffs were suspended, specifically Plaintiffs were suspended for the failure to "cooperate in every way with the commissioner . . . during the conduct of an investigation, including responding correctly, to the best of his or her knowledge, to all questions pertaining to racing matters." Mich. Admin. Code R. 431.1035(2).

Plaintiffs are simply incorrect in arguing they were denied procedural due process because they were summarily suspended pursuant to MICH. COMP. LAWS § 431.316(7). A summary suspension occurs when the Executive Director suspends a licensee on motion or complaint *prior* to an administrative hearing. *See* MICH. COMP. LAWS § 431.316(7) (emphasis added). In this case, Plaintiffs were suspended after a Stewards' hearing. This is supported by the testimony of Defendants Kalm, Parker and Garrison. *See* Defs.' Resp. to Mot. for Summ. J., Exs. 1, 2 and 6. Therefore, Plaintiffs were not summarily suspended under § 431.316(7) and the fourteen day provision is inapplicable herein. As such, Plaintiffs were not denied procedural due process prior to the suspension of their licenses and Defendants are likewise entitled to judgment in their favor on this

claim.

### iii. Unconstitutional Conditions

The doctrine of 'unconstitutional conditions' provides that the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the constitutional right." *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). Plaintiffs maintain that Defendants have subjected them to an unconstitutional condition by requiring Plaintiffs to waive their Fifth Amendment right against self-incrimination or suffer the adverse consequences of losing their livelihoods.

The leading case concerning the use of statements during an investigation is the United States Supreme Court decision in *Garrity v. New Jersey*, 385 U.S. 493, 499 (1967), where the court held that when public employees provide statements during an investigation into their workplace conduct, such statements cannot be used in a subsequent criminal proceeding. *Id.* In *Garrity*, the plaintiff-officers were being investigated for alleged wrongdoing in the handling of certain cases. *Id.* at 494. Prior to questioning, the plaintiff-officers were informed that they could invoke their Fifth Amendment right against self-incrimination but if they chose to rely on this right, they would be subject to removal. *Id.* The officers' statements were subsequently used against them in a criminal proceeding. *Id.* at 495. The *Garrity* court held that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak or remain silent[,]" thus the use of the plaintiff-officers' statements in the later criminal action was unconstitutional. *Id.* at 500.

> Later, the United States Supreme Court held that if an employee
>
> refuse[s] to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with

> respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self-incrimination would not [be] a bar to his dismissal.

*Gardner v. Broderick*, 392 U.S. 273, 278 (1968). Therefore, taken together, these cases demonstrate that "a government employee who has been threatened with an adverse employment action by her employer for failure to answer questions put to her by her employer receives immunity from the use of her statements . . . in subsequent criminal proceedings, and, consequently, may be subject to such an adverse employment action for remaining silent." *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 501 (1st Cir. 2007). *Gardner* and its progeny do not prohibit an employer from questioning an employee concerning matters related to that employees' official duties. *See Aguilera v. County of Los Angeles*, 510 F.3d 1161, 1171 (9th Cir. 2007). "In *Gardner*, the Court noted that the constitutional violation arose not when a public employee was compelled to answer job-related questions, but when that employee was required to waive his privilege against self-incrimination while answering his employer's legitimate job-related questions." *Id.; see also, Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 801, 806 (1968) ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity."); *Wiley v. Mayor & City Council of Baltimore*, 48 F.3d 773, 777 (4th Cir. 1995)("This language strongly indicates that forcing a public employee to answer potentially incriminating job-related questions does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege.")

Here, similar to the facts in *Aguilara*, Defendants did not violate Plaintiffs' Fifth Amendment right when they questioned them during the stewards' hearing about possible race fixing because Plaintiffs were not forced to answer the stewards' questions nor were they required to waive their

-14-

Fifth Amendment rights. *See Aguilara*, 510 F.3d at 1172 (finding no constitutional violation where "the deputies were not compelled to answer the investigator's questions or to waive their immunity from self-incrimination. Indeed, it appears that the deputies were never even asked to waive their immunity."); *see also Morgan v. City of Columbus*, No. 92-4086, 1993 U.S. App. LEXIS 25698, *21 (6th Cir. Oct. 1, 1993) (concluding the Fifth Amendment posed no bar to the plaintiff's discharge when he refused to answer questions that would incriminate him during the police department's internal affairs's investigation of his conduct because "he was not required to answer those questions that might be incriminatory . . . .")

Moreover, Plaintiffs' claim also fails because they have never been charged with a crime and the Sixth Circuit Court of Appeals has held that "mere coercion does not violate the . . . Self-Incrimination Clause absent such use of the compelled statements in a criminal case." *McKinley v. City of Mansfield*, 404 F.3d 418, 430 (6th Cir. 2005). The *McKinley* court also indicated that "only once compelled incriminating statements are used in a criminal proceeding" has an "accused suffered the requisite constitutional injury for purposes of a § 1983 action." *Id.*; *see also Lingler v. Fechko*, 312 F.3d 237, 238 -240 (6th Cir. 2002) (no Fifth Amendment violation sufficient to sustain a § 1983 action where police officer-employees who made incriminating statements in compulsory interviews with superiors were never prosecuted." )

Lastly, Plaintiffs have not shown that their statements were in fact entitled to Fifth Amendment protection. Here, the stewards posed several questions to the Plaintiffs which had no criminal implications attached to them. Moreover, Plaintiffs now maintain that they were not involved in race fixing , therefore the Fifth Amendment has no relevance to the instant proceedings as none of Plaintiffs' answers would subject them to criminal sanctions. Accordingly, based on the

-15-

above considerations, Plaintiffs' unconstitutional conditions claim fails as a matter of law.

## C. Plaintiffs' Amended Motion for Partial Summary Judgment

In the present motion, Plaintiffs seek judgment in their favor on their due process and unconstitutional conditions claims, as well as a permanent injunction requiring Defendants to accept their applications and issue occupational licenses. As previously found by this Court, Plaintiffs were neither suspended nor excluded for exercising their Fifth Amendment rights, rather Plaintiffs were disciplined for their failure to cooperate, a condition precedent to occupational licensing under the Horse Racing Law. Plaintiffs cannot demonstrate a viable unconstitutional conditions claim because the stewards never required that Plaintiffs waive their constitutional right to remain silent, rather Plaintiffs asserted their Fifth Amendment rights and those rights have not been infringed upon. *McKinley*, 404 F.3d at 430; *Lingler*, 312 F.3d at 238 -240; *Morgan*, 1993 U.S. App. LEXIS 25698, at *21; *Aguilera*, 510 F.3d at 1171; *Sher*, 488 F.3d at 501.

Additionally, Plaintiffs' substantive and procedural due process claims fail as a matter of law. Plaintiffs have no property or liberty interest in occupational licenses, nor were they summarily suspended under MICH. COMP. LAWS § 431.316(7). *See Medina*, 545 F.2d at 251; *Payne*, 925 F.Supp.at 424-25, n.5; *Ziskis*, 726 F.Supp. at 910-11; *Roth*, 408 U.S. at 577.

Based on the foregoing, Plaintiffs are not entitled to injunctive relief because their claims lack merit. *See McCuiston v. Hoffa*, 351 F.Supp. 2d 682, 689 (E.D. Mich. 2005)("At the permanent injunction stage, the requirements for injunctive relief are success on the merits . . . ."). Accordingly, Plaintiffs' Motion for Partial Summary Judgment is denied.

**IV.   CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment [#85] is GRANTED.

Plaintiffs' Amended Motion for Partial Summary Judgment [#98] is DENIED.

Plaintiffs' Motion for Order to Allow Deposition of Non-Party Witness [#97] is MOOT.

Defendants' Motion to Strike [#112] is GRANTED.  Document No. 111 is hereby STRICKEN.

Plaintiffs' Motion to File Supplemental Authority [#114] is DENIED.

This cause of action is dismissed.

SO ORDERED.

Dated: November 27, 2013                                          /s/Gershwin A Drain
                                                                                    GERSHWIN A. DRAIN
                                                                                    U.S. DISTRICT JUDGE